Filed 8/28/14  P. v. Colbert CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>CHARLES COLBERT,<br><br>        Defendant and Appellant. | B247634<br><br>(Los Angeles County<br> Super. Ct. No. BA370462) |

APPEAL from the judgment of the Superior Court of Los Angeles County. Monica Bachner, Judge.  Affirmed.

Ralph H. Goldsen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Eric E. Reynolds and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## SUMMARY

Defendant was charged in a one count amended information with premeditated murder, with firearm allegations (Pen. Code, §§ 187, subd. (a), 12022.53, subd. (d)). He was convicted by jury of second degree murder, and the firearm allegations were found true. Defendant was sentenced to a total term of 40 years to life, consisting of 15 years to life for the murder and 25 years for the firearm enhancement.

The victim, Conrad Phillip, was shot once in the head, on the corner of Los Angeles and 6th Streets, near the residential hotel where both defendant and Mr. Phillip lived. The evidence at trial consisted mostly of still photographs taken from various surveillance cameras located near the shooting, showing defendant running away from the murder scene. Witnesses also testified to hearing a gunshot and seeing someone running away, wearing clothes like defendant's.

On appeal, defendant contends the timestamp on some of those videos (those that most clearly depicted the events) was inadmissible, because it was not properly authenticated, was hearsay, and violated his right to confront the witnesses against him; defendant characterizes the timestamp as "testimonial." Defendant also argues he was deprived of his right to effective assistance of counsel when his trial attorney failed to seek redaction of various hearsay statements made by police during a recorded interrogation of defendant that was played for the jury. Defendant also contends the trial court abused its discretion when it allowed lay opinion evidence by the investigating officer that defendant was the man depicted on the videos, and that he was the one who murdered the victim. We agree the investigating officer provided an improper opinion that defendant was the one who murdered Mr. Phillip, but we find the error in the admission of this evidence was harmless. Accordingly, we affirm.

## FACTS

On April 16, 2010, Angela Anthony was employed as a desk clerk at the Pershing Hotel, located at 502 South Main Street in Los Angeles. The Pershing Hotel is a residential hotel with 69 rooms. Both defendant and Mr. Phillip resided there. They were neighbors, with rooms next door to each other.

2

The hotel has a number of security measures in place.  It has two exterior entryways; the main entrance is located at 502 South Main Street and the other is located at 511 5th Street.  These entrances are kept locked, and residents are given keys.  The hotel has 11 surveillance cameras.  Ms. Anthony was familiar with how the cameras work.  One of her duties was to review the surveillance footage on a daily basis.  Every day she worked, she reviewed the footage taken between 5:00 p.m. and 7:00 p.m. (during which time there is no desk clerk on duty) to determine whether any guests or people who did not live at the hotel had come in.  Residents are permitted to have guests only three nights a week.  If guests are staying overnight, they are supposed to be signed in on an "overnight sheet."  The front desk also is not staffed between the hours of 4:00 a.m. and 8:00 a.m.

When Ms. Anthony started working at the Pershing Hotel in 2008, defendant was already residing there.  She saw him almost every day she worked.  To enter the hotel, residents had to walk past the front desk where Ms. Anthony was stationed.  Defendant had a "distinguished type of walk."  "He kind of bounces when he walks, like on his tip toes . . . ."  Defendant also often wore a greenish military jacket, and black and white Chuck Taylor All Star shoes.  No other resident of the Pershing Hotel wore a green jacket and black and white Chuck Taylor shoes.  Mr. Phillip also had a distinct appearance because of his dreadlocked hair, and the hat he often wore with his hair piled into it.

As part of her job, Ms. Anthony would handle complaints by residents.  Defendant complained that Mr. Phillip's television or music was too loud.  However, he never complained about any "big" or significant issues with Mr. Phillip, and he also complained about other residents.  On one occasion, Ms. Anthony heard defendant and Mr. Phillip having a loud argument in the community kitchen.  Mr. Phillip had a knife in his hand, but he was not threatening defendant with it.  When Ms. Anthony entered the kitchen, defendant "went on his way" and Mr. Phillip continued to cook.  Defendant once said he was going to "kill" Mr. Phillip because of the noise he made, but Ms. Anthony did not understand his comment to be serious.  There was always a little conflict between

3

Mr. Phillip and defendant. However, the conflict was generally limited to "bickering," and Ms. Anthony never thought "somebody might end up dead . . . ."

After the shooting, Ms. Anthony helped police obtain videos from the hotel's surveillance system. The videos appeared to show defendant leaving the hotel shortly after Mr. Phillip, returning a short time later, and leaving again. Ms. Anthony identified a number of exhibits, consisting of packets of still photographs extracted from the footage from the hotel's video system. The photographs showed the sidewalk in front of the hotel's Main Street entrance, the stairwell inside the door, and the hallway where defendant's and Mr. Phillip's rooms were located.

In a photograph with a timestamp of 05:52:24:437, Ms. Anthony explained that the person on the sidewalk in front of the Pershing Hotel appeared to be Mr. Phillip. She believed she recognized his backpack and the way his "hoodie" was worn over his hair. Two minutes later, in a photograph timestamped 05:54:27:781, there are two people on the sidewalk. Ms. Anthony believed the person on the left was defendant, based on the greenish military jacket, and his shoes.

Ms. Anthony identified additional images from the Pershing Hotel's cameras. The photograph timestamped 6:12:05:687, of a person approaching the hotel's Main Street entrance "possibly" showed defendant. Other images depicted the hallway in the hotel where defendant's and Mr. Phillip's rooms were located. Defendant was in the photograph timestamped 6:12:58:062. Defendant was also in the hallway photographs timestamped 6:13:02:265, 6:13:03:156, and 6:16:07:968. Ms. Anthony was confident the person in the photographs was defendant because of the white tipped shoes. Ms. Anthony identified defendant in additional photographs of the Main Street sidewalk in front of the hotel, timestamped 06:16:44:109 to 06:16:48:406. She recognized the person leaving the hotel as defendant based upon the do rag on his head, his jacket, and by the bouncy way he walked on the tip of his toes on the video from which the still photographs were derived.

The timestamps for all of the Pershing Hotel's cameras are linked, and therefore the timestamp is the same for all of the cameras. When asked about the accuracy of the

4

timestamp, Ms. Anthony testified that in April 2010, the timestamp was off by seven or eight minutes from real time. She was not really sure of this but said "it's always off by minutes to actual time." The prosecutor impeached Ms. Anthony with her testimony from the September 2010 preliminary hearing, where she testified: "Our camera is an hour fast, but you have to when you write stuff down, you have -- you have to put camera time and actual time." At the preliminary hearing, she was also asked "how do you know that the camera is an hour fast?" She responded, "I think because when the time went back, we never set the clock back in the computer." Ms. Anthony affirmed she testified truthfully at the preliminary hearing. She then agreed the timestamp was an hour fast on the day of the murder. Defense counsel did not object to any of Ms. Anthony's testimony concerning the timestamp.

During cross-examination, Ms. Anthony confirmed she told police the timestamp was an hour fast. Ms. Anthony believed the time on the hotel's time clock had been changed, but the cameras' timestamps were not changed. The cameras are only changed if they "go down." It was generally understood by employees at the Pershing Hotel that the camera timestamp was off because of daylight savings. When defense counsel asked Ms. Anthony whether the timestamp would be slow rather than fast, she responded that "whatever we have to do in the Springtime to the time, we didn't do it to the camera." Counsel asked, "In the Spring, when daylight savings time occurred and the time clock went forward one hour, you are saying that the camera clock stayed the same?" Ms. Anthony responded, "Exactly." Counsel then asked whether that meant the timestamp was one hour slow, and Ms. Anthony responded, "Yes." Then, apparently confused, Ms. Anthony testified she knew the timestamp was an hour off, but was not sure if it was fast or slow. She testified that she believed the clock was changed in the fall.

The court took judicial notice that in November 2009, clocks were set back, and in March 2010, clocks were set an hour ahead.

During redirect, Ms. Anthony clarified she was sure the timestamp was an hour fast, and that she was simply "frustrated" and confused when she testified otherwise during cross-examination.

Other witnesses testified to what they observed on the street on the morning of April 16, 2010. Earl McClinton worked as a security guard at the King Edwards bar on the corner of 5th and Los Angeles Streets. When he got off work, he and a friend walked up Los Angeles Street to go to a bar, but it was closed. Mr. McClinton saw "two guys" arguing, standing on Los Angeles Street near the corner of 6th Street, about half a block away from Mr. McClinton. No one else was near. Both men were black, and they were "screaming and hollering at one another back and forth." Mr. McClinton could not hear what they were yelling about. "[T]hen, the little short guy with the beanie on . . . shot the other guy."

Mr. McClinton heard one shot, saw one of the men fall, and saw the other take off running "very quickly." The man ran up 6th Street, towards Main Street. He did not see anyone else running westbound on 6th Street. Mr. McClinton called 911 within two seconds of the shooting. He did not get a good look at the men. One was tall, and one was "very short" with a "little beanie" and a "little hood thing on." The short man was the shooter. Mr. McClinton testified that it "seem[ed] like [the men] were arguing over money or something." However, he was not sure what they were arguing about.

That same morning, at about 5:00, Peter Nwude was working as the security concierge at the Santa Fe Loft complex on 6th Street between Main and Los Angeles Streets. Mr. Nwude was at his station watching the security cameras when he heard a loud "bang." He looked at the monitor, and saw "somebody . . . going down and another person . . . running towards . . . 6th Street." Mr. Nwude walked out of the lobby onto 6th Street to intercept the person who was running. He saw a black man running toward Main Street. The man was almost six feet tall, and was running fast. The man was wearing a green army jacket and a do rag on his head. Mr. Nwude told the man to "stop." The man stopped, looked at Mr. Nwude, and then kept running. Mr. Nwude gave chase on 6th Street until the man turned right onto Main Street. Mr. Nwude stopped chasing

6

him on the corner of 6th and Main. Mr. Nwude then went to investigate where he heard the noise, and found a dead man on the corner of 6th and Los Angeles Streets. It looked as if he had been shot in the head. Mr. Nwude called 911.

Mr. Nwude testified at trial he did not see the man do anything with his hands. However, at the preliminary hearing, Mr. Nwude testified the suspect was reaching into his pocket with his right hand as he was running. Mr. Nwude also had testified at the preliminary hearing that defendant was similar in his build and physical appearance to the person Mr. Nwude saw running. The man had a dark complexion and was tall and slender.

Police came to review the Loft's surveillance tapes. The images from the camera that caught the shooting were blurry. Mr. Nwude identified various photographs at trial as coming from the Loft's video of the shooting, and noted that the dead body could be seen in one of the photographs. Mr. Nwude also identified photographs of 6th Street taken from the video, and confirmed that they showed him chasing the person running away from the shooting.

During cross-examination, Mr. Nwude admitted he had identified a man in a photographic array who was not defendant.

At 5:00 that morning, Benjamin Hughes was heading out the door, on his way to the airport, when he heard a gunshot outside his window. His second floor loft was on the corner of 6th and Los Angeles Streets, and he had a view of 6th Street all the way to Main Street. Mr. Hughes looked out his window and saw an African-American man running from Los Angeles Street up 6th Street, holding a shiny silver gun in his hand. He described the man as tall with an athletic build. He saw the man turn onto Main Street. He was wearing black shoes with white trim, fitted blue jeans, a three-quarter length army-like coat, and a nylon do rag. The gun was in his right hand, and while he was running, he was struggling to put it in his jacket. The man was running "full speed." Mr. Hughes saw Mr. Nwude, who he knew was a security guard for the lofts across the street, come out and chase the runner. Mr. Hughes did not see anyone else on the

7

sidewalk.  The jacket the runner was wearing was olive green, with a hood.  The runner had an average build.

During cross-examination, Mr. Hughes admitted he was unable to identify the shooter in a photographic lineup.

The deputy medical examiner, Dr. Jeffrey Gudstadt, performed the autopsy on Mr. Phillip.  Mr. Phillip died from a gunshot wound to the head.  There was stippling near the entry wound, which occurs when someone is shot at close range.  The stippling indicated that Mr. Phillip was shot at a distance between one and a half inches and two feet.

Michael Rizzo runs a business called RZO Hothouse, which occupies the buildings at 530 South Main Street and 533 Los Angeles Street.  The buildings span the entire block between Main and Los Angeles Streets, and have security cameras facing both streets.  Mr. Rizzo did not witness the shooting, but he identified a number of still photographs as coming from his cameras.

Los Angeles Police Officer Sergio Ortiz arrived at the murder scene at about 6:30 a.m.  He searched the vicinity for video cameras that may have caught footage of possible suspects.  Officer Ortiz found approximately 15 cameras in the area.  Once Mr. Phillip's identity was confirmed by the coroner, Officer Ortiz determined he was a resident of the Pershing Hotel.  Defendant was identified as a suspect after Ms. Anthony identified him on the hotel's security footage.  Officer Ortiz obtained a search warrant and searched defendant's room at 4:00 a.m. on the day after the shooting.  When police searched defendant's room, they found a green army jacket.  They did not find any Chuck Taylor shoes or a gun.  The police issued press releases, identifying defendant as a "suspect at large" in the murder.  Defendant was taken into custody at 11:30 p.m. on April 18.

Officer Ortiz reviewed all of the video footage of 5th, Los Angeles, 6th, and Main Streets.  He made a diagram showing defendant's and Mr. Phillip's movements leading up to the shooting, based on all of the footage.  The diagram noted the camera locations and angles.  According to Officer Ortiz's testimony, as illustrated in the diagram,

8

Mr. Phillip left the Pershing Hotel shortly before 5:00 a.m., heading south on Main Street, cutting through a parking lot between Main and Los Angeles Streets, and then turned south on Los Angeles Street.[1] A couple of minutes later, defendant left the Pershing Hotel, traveling north on Main Street, turning right on 5th Street, and right on Los Angeles Street. He then ran and turned right on 6th Street, right on Main Street, returned to the Pershing Hotel, and then left the hotel again.[2] Officer Ortiz also compiled the relevant video footage into a PowerPoint presentation, which organized the still images depicting the victim and the defendant in chronological order.[3]

On cross-examination, Officer Ortiz admitted that Mr. Phillip was five feet seven inches tall, and that defendant is six feet tall. On redirect, Officer Ortiz opined that Mr. McClinton perceived the shooter was shorter than Mr. Phillip because Mr. Phillip's very long dreadlocks were piled on top of his head, making him appear much taller.

The People then closed and sought to move all their exhibits into evidence. Defense counsel "renewed" her objection to the PowerPoint presentation, reasoning the "time and date stamp has [not] been authenticated" for the still photographs from the

---

[1] Defense counsel's objection for lack of foundation, regarding the victim's route, was sustained. Officer Ortiz then testified that he viewed the Pershing Hotel's video footage. He saw the victim leave the Pershing Hotel, and walk south toward 6th Street. Defense counsel again objected for lack of foundation. The trial court overruled the objection, reasoning "this is the witness's opinion."

[2] Defense counsel also objected for lack of foundation to Officer Ortiz's testimony that defendant was the man seen in the images. The trial court asked the prosecutor to lay a foundation. The prosecutor asked Officer Ortiz what his opinion was based on. Officer Ortiz responded, "the videos that I have viewed, the totality of this incident, the information I've learned throughout the investigation." Apparently satisfied, defense counsel did not object again as Ortiz continued to testify that the person seen in the photographs was defendant.

[3] Ms. Anthony, Mr. Nwude, and Mr. Rizzo all confirmed that still photos from the exhibits they were shown matched the images in the PowerPoint presentation, which compiled the still images taken from the Pershing Hotel, Santa Fe Loft, and RZO Hothouse's cameras.

Pershing Hotel.  Defense counsel argued "the testimony by Ms. Anthony was so convoluted, that she couldn't figure out why she thought that the . . . particular footage was an hour ahead. . . .  She couldn't figure it out."  The trial court admitted the evidence, reasoning that Ms. Anthony had laid an adequate foundation, and that the issues regarding the timestamp went to the weight of the evidence but not its admissibility.

Edwin Madrigal, the property manager for the Pershing Hotel, testified for the defense.  He was unable to locate any complaints or incident reports in either defendant's or Mr. Phillip's files.

Elizabeth Aguilar, a defense investigator, interviewed Ms. Anthony over the phone in September 2010.  Ms. Anthony told her that a few weeks before the murder, defendant and the victim were seen talking and laughing together.  Ronald Y. Ito, also a defense investigator, interviewed Mr. McClinton, who described the shooter as wearing dark baggy clothing and a hoodie.

Ronald Stanley Guzek, an expert in audio and video analysis,  reviewed the surveillance videos and the PowerPoint compiled by Officer Ortiz.  When analyzing video images in order to identify an individual, Mr. Guzek attempts to match a photograph to the video images.  He looks for unique personal characteristics that might help identify a person in low quality video images, such as a large jaw or nose.  Mr. Guzek used photographs of defendant from different angles, and compared them to images from the Pershing Hotel's cameras.  Defendant's left ear sticks out.  The images from the video were so blurry that Mr. Guzek was unable to locate an ear from the suspect to compare to defendant's.  Mr. Guzek testified "there was nothing there that indicated a left ear was sticking out."

Margat Kaleuati, senior criminalist with the Los Angeles County coroner, testified that gunshot residue tests can be performed on clothing.  On cross-examination, Ms. Kaleuati admitted that recent scientific working group recommendations, and the policy of her department, is that gunshot residue tests of hands are most probative.  Most labs use a limit of three to five hours between a shooting and testing for gunshot residue on hands.  With a hypothetical based on the facts of this case, Ms. Kaleuati opined that it

10

would not be reasonable to perform gunshot residue tests on the suspect's hands. On redirect, Ms. Kaleuati testified that her lab was never asked to perform gunshot residue tests on any article of clothing in this case.

Greg Dooley, a criminalist with the Los Angeles County Police Department's Serology and DNA unit, testified that he was asked to search for blood and DNA on defendant's jacket. He tested several brownish stains for blood, and the tests were negative. He also did a general swab of the surface of the jacket and found no blood.

The prosecution recalled Officer Ortiz in rebuttal, and he testified that on April 18, 2010, the day of defendant's arrest, defendant called Officer Ortiz, because he had seen his face in the news and "[w]anted to come in and clear up his name." Officer Ortiz picked up defendant and brought him to the central station. Defendant was given *Miranda*[4] warnings and interviewed. That interview was video recorded and played for the jury.[5]

In the interview, defendant was asked a series of booking questions, and then the *Miranda* warnings were read to him. He waived his rights, and spoke with the officers. Officer Ortiz's partner, Detective Marengo, asked defendant where he was at 5:00 a.m. on April 16. Defendant said he was at his friend Trish's house on 98th Street. He had seen an article about a dog attack, and was concerned because he kept a dog at Trish's house. He woke up around 4:00 a.m. and caught the 52 bus at around 4:00 or 4:15 a.m. He walked down 6th and Main Streets to catch the bus, but he missed it. He decided to run back to his room to change his jacket, after realizing the jacket he was wearing was too heavy for the weather that day. The first jacket was a green army-style jacket.

Defendant then decided he would catch the 45 bus. He boarded that bus at around 4:20 a.m. at 5th and Broadway, and was at Trish's house by 5:00 a.m. Defendant described the bus driver as a "cross dresser" or an unattractive woman with a reddish wig.

---

**4**    *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

**5**    There were some objections to the admission of this evidence that are discussed, *ante*.

11

He said Trish could verify his story, as could Trish's neighbor, who saw defendant pulling Trish's trash cans out to the street.

When shown a picture of Mr. Phillip, defendant identified him as his neighbor. He denied that he and Mr. Phillip had any problems.

Detective Marengo then told defendant, "I know you're lying to me. [¶] . . . [¶] . . . Cause you and Trish couldn't even get your stories straight." When told that there was video footage of him at 6th and Los Angeles Streets at 5:00 a.m., defendant said, "I don't think so." Detective Marengo then told defendant the video showed him running around the corner on 6th Street, and running past a security guard, who saw defendant fleeing in his green jacket after defendant shot the victim. Detective Marengo then said, "And I've already checked your phone and I know that you were not at Trish's house because you were making calls to her house, okay? So come on, please do not insult me."

Detective Marengo also told defendant, "I have an independent witness who also saw you with a gun as you were running so that – that is the fact. That's where we're at. [¶] . . . [¶] . . . I have a judge who's already looked at this case. . . . [¶] He signed a warrant for your arrest. So now, you want to tell me what really happened between you and your neighbor?" Defendant continued to deny shooting Mr. Phillip.

Detective Marengo told defendant, "When I . . . send your green army jacket to the lab . . . [¶] . . . [¶] . . . to check for gunshot residue . . . [¶] . . . [¶] . . . it's going to come back positive." Defendant maintained, "I don't . . . think so." Defendant insisted he did run into the hotel to change his jacket after missing his bus. Detective Marengo told defendant he was identified by his jacket, his shoes, and by "people who know you. . . . They said, 'Oh, that's . . . Charles Colbert.' " Detective Marengo said, "I have your phone records. . . . [¶] . . . [¶] . . . 6 o'clock you were calling Trish's house. 6 o'clock Friday morning you were on your phone calling Trish's house. You see all those things are verified. If you were there, then why -- what was the need to call her house if you were already there?" Defendant continued to deny shooting Mr. Phillip.

12

Defendant said he would like to see the video they were referring to. Detective Marengo told him, "You'll see – you'll see it when you go to court. I was hoping you'd come up with a better explanation about what happened between you and your neighbor." Defendant continued to deny shooting the victim, claiming he did not have a gun. Detective Marengo replied, "Not anymore. You got rid of it." He accused defendant of taking the gun to Trish's house where the two of them disposed of it. When defendant said, "Trish don't have anything to do with anything . . . ," Marengo retorted, "She tried to lie for you and she didn't do a good job of that either cause . . . you[] guys['] stories are like . . . complete opposites." Detective Marengo repeated that defendant was captured on the video running away from the shooting.

During cross-examination, defense counsel asked Officer Ortiz whether it is permissible for officers to lie to a suspect during an interrogation. Officer Ortiz answered, "yes," and explained that as part of their interrogation technique, an officer will tell a suspect they know he is guilty. Defense counsel also asked, "You didn't show [defendant] the content of any CD's or DVD's; is that correct?" Officer Ortiz responded, "Of course not, no." Defense counsel continued, "And that – and because you can lie, sometimes you may say that you have evidence that you don't have; is that fair to say?" Officer Ortiz testified, "In this case, we didn't. We can lie to them, yes."

Rebuttal witness Maria Canales testified that in April 2010, she was a bus driver for the Metropolitan Transit Authority (MTA). At that time, Ms. Canales's hair was red, or reddish blonde. She drove the 45 line, from Lincoln Heights to the Cities of Gardena and Carson. Ms. Canales drove this route for eight years. She drove the night shift, from 7:45 p.m. to 5:45 a.m. Her route would take the bus southbound on Broadway, through downtown Los Angeles, stopping at 2nd, 3rd, 4th, 5th, and 6th Streets. She recognized many of the riders on her bus, including defendant, as regular riders.

At 4:00 a.m. on any given shift, Ms. Canales would be taking the final trip of her shift, coming back from Carson City. She would drop off all of her passengers at 7th and Broadway, the end of the line, and turn around to travel the other direction on Broadway. The first stop after dropping off everyone was at 5th and Broadway. The actual time of

the stop would vary, but Ms. Canales was scheduled to reach the stop at 7th and Broadway by 4:10 a.m. Ms. Canales's bus was equipped with cameras in April 2010. In 2010, Officer Ortiz showed Ms. Canales a video of one of her bus shifts. She was able to identify the video as coming from her bus. Footage spanning 4:10 a.m. to 4:19 a.m., between the stop at 7th and Broadway, and the southbound trip down Broadway, ending at Pico, was played for the jury.[6] None of the passengers getting on or off the bus was defendant.

Jesse Cortez, the custodian of records for the MTA, testified. He knew how videos from MTA buses are kept and stored. He provided the footage for April 16, 2010, to the Los Angeles Police Department. The time and date stamps are correct; the bus footage is synchronized to an automatic clock. There are safeguards in place to make sure footage is not altered.

## DISCUSSION

Defendant makes four contentions on appeal. First, he contends the trial court abused its discretion when it admitted the timestamp on the video derived from the Pershing Hotel's cameras, reasoning that Angela Anthony did not properly authenticate it because she did not enter the timestamp into the system and did not witness the video as it was recorded. Moreover, he claims the timestamp is hearsay, and its admission violated defendant's right to confront the witnesses against him, reasoning the timestamp is testimonial. Defendant next argues he was deprived of his right to effective assistance of counsel when his attorney did not seek redaction of hearsay statements made by police during defendant's videotaped interrogation. Third, defendant contends the trial court

---

[6] Defense counsel objected to the foundation for the date and timestamp on the video. The objection was sustained, and the prosecutor attempted to lay a foundation. Ms. Canales testified she was unsure how the bus cameras were maintained and how the recordings are made. Therefore, defense counsel renewed her objection. Ultimately, the objection was sustained, and the prosecution was required to call Jesse Cortez to authenticate the date and timestamp.

14

erred when it permitted Officer Ortiz to testify as to his "lay opinion" that still images derived from various surveillance videos captured defendant. Lastly, defendant complains of cumulative error.

We are not persuaded that any of these arguments merit reversal. Ms. Anthony, whose job it was to daily review the video footage and maintain the log of events on that footage, was qualified to authenticate the video images, and their timestamp. Any weaknesses in her testimony went to the weight of the evidence, and not its admissibility. As to the admission of the unredacted interview of defendant, defendant's trial counsel was not ineffective, as the record reveals a tactical reason behind counsel's failure to object. Although we agree the investigating officer improperly provided an opinion that defendant was the one who murdered Mr. Phillip, the error in the admission of this evidence was harmless.

## 1.    Timestamp Evidence

Respondent contends defendant's claims of error concerning the timestamp were forfeited because defendant never objected on the bases asserted on appeal. We find defendant has preserved these issues for appellate review, but that the claims of error fail on their merits.

" '[A] trial objection must fairly state the specific reason or *reasons* the defendant believes the evidence should be excluded. If the trial court overrules the objection, the defendant may argue on appeal that the court should have excluded the evidence for a reason asserted at trial. A defendant may not argue on appeal that the court should have excluded the evidence for a reason not asserted at trial.' [Citation.]" (*People v. Chaney* (2007) 148 Cal.App.4th 772, 778.)

When the prosecutor asked Ms. Anthony a series of questions about a packet of still photographs taken from the Pershing Hotel's video footage (exh. 3), Ms. Anthony testified that the photographs were of "somewhere on Main Street by the Pershing Hotel from our camera." When asked what she saw in exhibit 3D (the fourth photograph in the packet), Ms. Anthony believed she saw the shadow of a person, but was unsure. Defense counsel objected that her testimony lacked foundation. Defense counsel argued, "She has

15

not indicated that this is a video from the Pershing Hotel. This is a separate camera. She hasn't indicated, she said she doesn't know. She's confused, and she left it at that." The prosecutor argued he was "not actually trying to get the witness to authenticate this particular sequence of photographs as being from the Pershing Hotel. She has as far as I know never seen these photographs. What I'm trying to elicit is whether she recognizes the individual who's in them . . . ." The court overruled the objection "since she's not being used to authenticate it." Defense counsel never objected to any of Ms. Anthony's testimony concerning the timestamp.

Later, when the prosecution moved all their exhibits into evidence, defense counsel "renewed" her objection to the photographs from the Pershing Hotel because she did not "believe the time and date stamp has been authenticated" and that it was irrelevant and prejudicial. Counsel argued "the testimony by Ms. Anthony was so convoluted, that she couldn't figure out why she thought that the . . . particular footage was an hour ahead. . . . She couldn't figure it out." The trial court admitted the evidence, finding it relevant, and finding that the issues regarding the timestamp went to the weight of the evidence but not its admissibility. The court also found Ms. Anthony laid an adequate foundation.

Later, in the context of defense counsel's objection to the authentication of the timestamp for the video of Ms. Canales's bus,[7] defense counsel "renew[ed]" her objection to the Pershing Hotel's timestamp, reasoning that Ms. Anthony was not the custodian of records and could not authenticate the timestamp. Counsel asked the court to reconsider its earlier ruling admitting the evidence. The trial court indicated it would read the case law provided by counsel and allow counsel to renew her objection.

---

[7] As described in footnote 6, defense counsel objected to the foundation for the date and timestamp on the video of Ms. Canales's bus route that was introduced as part of the prosecution's rebuttal case. After reviewing cases provided by defense counsel, the court determined that the timestamp had not been properly authenticated, and the prosecutor therefore called the MTA's custodian of records to authenticate the timestamp.

16

After the MTA's custodian of records testified about the timestamp on the bus video, defense counsel again "renewed" her objection to the Pershing Hotel's timestamp evidence, reasoning that Ms. Anthony's testimony was incompetent, as she did not manage or maintain the video equipment at the hotel, and was not the custodian of records. Also, counsel argued that Ms. Anthony's statement that the timestamp is an hour fast was based on hearsay. The prosecutor countered that Ms. Anthony testified one of her duties was to review the video and compare it to real time. The trial court overruled the objection, reasoning that Ms. Anthony knew, from her own knowledge, and not hearsay, that there was a difference between what was on her watch or other clock and the video footage.

We find that defendant's challenge to the authentication of the timestamps was preserved for appellate review. Although counsel did not object to the timestamp during Ms. Anthony's testimony, counsel lodged an objection when the prosecution sought to have the exhibits moved into evidence, and the parties and trial court engaged in a lengthy discussion of whether the timestamps had been adequately authenticated. The purpose of the waiver doctrine is to bring errors to the trial court's attention so that they can be corrected and avoided. (*People v. Simon* (2001) 25 Cal.4th 1082, 1103.) On this record, the trial court was afforded an opportunity to determine whether the timestamp was authenticated.

The trial court was not asked to decide, however, whether the timestamp itself constituted hearsay (as opposed to defendant's argument during trial that Ms. Anthony's knowledge was based on hearsay) or violated defendant's right to confront witnesses. Nevertheless, a defendant's failure to object below does not preclude him from raising constitutional claims on appeal. (*Hale v. Morgan* (1978) 22 Cal.3d 388, 394 [court may review constitutional errors without objection].) To the extent that defendant's confrontation clause claim encompasses his hearsay claim, we will reach the merits of these asserted errors as well, even if only to forestall a future claim of ineffective assistance of counsel. (*People v. Mattson* (1990) 50 Cal.3d 826, 854.)

17

Defendant argues the standard for authenticating "device-generated evidence" like a timestamp should not be the same as the standard for authenticating photographs, videos, or other writings, because a timestamp is not simply an image recorded by the camera, but is instead a "statement" by the machine. Generally, a film or photograph may be authenticated by "the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is." (Evid. Code, § 1400; see also § 1401.) Defendant also contends that to the extent the timestamp is "spoken" by the machine, it constitutes hearsay, and because surveillance videos and their timestamps are intended to be used as evidence, it is testimonial and implicates the confrontation clause.

The California Supreme Court recently decided these claims against the defendant in *People v. Goldsmith* (2014) 59 Cal.4th 258 (*Goldsmith*),[8] where the court considered the authentication requirements for evidence generated by an automatic traffic enforcement system (a red light camera), and whether such evidence was hearsay. During her trial for a red light infraction, Goldsmith made hearsay and lack of foundation objections to the automated enforcement evidence, which consisted of photographs and video capturing her infraction. (*Id*. at p. 265.) The foundation for the exhibits was laid by Dean Young, an investigator with the Inglewood Police Department. He testified the automated traffic enforcement system was operated by the police department, but was maintained by a vendor, Redflex Traffic Systems, Inc. Based on information obtained from city engineers and Redflex, Mr. Young testified the system records events occurring in an intersection after the light turns red, and that this information is stored in a hard drive at the scene, and periodically retrieved by Redflex through an internet connection. A police officer then reviews the photographs before a citation is issued. The system takes three photographs, and a 12-second video. A data bar is printed on the photographs, showing the date, time, and location of the violation. Mr. Young then

---

[8]    We requested, and the parties provided, supplemental briefing on the impact of this case, which was decided during the pendency of this appeal.

testified to the date, time, and location of defendant's violation, based on the data bar. The trial court overruled the hearsay and foundation objections. (*Id.* at pp. 264-266.)

The Supreme Court found that Mr. Young's testimony sufficiently authenticated the evidence, and that it was reasonable to conclude that the camera system "automatically and contemporaneously recorded the images of the intersection and the data imprinted on the photographs when it was triggered."[9] (*Goldsmith*, *supra,* 59 Cal.4th at pp. 270-272.) The Supreme Court also rejected the claim that in a "case involving *digital* images it [is] necessary for the prosecution as part of its foundational showing to additionally present the testimony of a Redflex technician regarding the operation and maintenance of the system that generated the . . . evidence because digital images are more readily and inexpensively subject to manipulation . . . ." (*Id.* at p. 272.) The court found that "[n]o elaborate showing of accuracy is required. (See 2 McCormick [on Evidence (7th ed. 2013)] § 227, p. 111 [accuracy of an individual computer's basic operations will not be scrutinized unless specifically challenged, and even perceived errors go to the weight of the evidence, not its admissibility].) . . . The standard foundational showing for authentication of a photograph, video, or other writing will suffice for [automated traffic enforcement system] images and data information." (*Goldsmith*, at p. 272, citations omitted.)

The Supreme Court further concluded that the automated traffic enforcement system's data bar, which included the date and time of the infraction, is not hearsay, because the data bar is machine generated, and is not a statement of a person as defined by the Evidence Code. Under section 1200, hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (*Id.*, subd. (a).) A statement is an "oral or written verbal

---

**9** The court also found that statutory presumptions found in Evidence Code sections 1552 and 1553, concerning the accuracy of computer information generated by automated traffic enforcement systems, supported a finding that the evidence was presumptively authentic. However, the court also concluded that these presumptions did not eliminate the need to authenticate the evidence under section 1401.

expression or . . . nonverbal conduct of a person intended by him as a substitute for oral or written verbal expression." (§ 225.) A person is "a natural person, firm, association, organization, partnership, business trust, corporation, limited liability company, or public entity." (§ 175.) Because the court concluded the evidence was not hearsay, it also rejected the defendant's confrontation clause claim. (*Goldsmith*, *supra*, 59 Cal.4th at pp. 273-274.)

Defendant's supplemental brief in essence concedes the hearsay and confrontation clause issues were decided against him in *Goldsmith*, but nonetheless contends that the evidence provided by Ms. Anthony does not rise to the level of that offered by Mr. Young in *Goldsmith*. We disagree, and conclude there was sufficient evidence to authenticate the surveillance videos. "[T]he proof that is necessary to authenticate a photograph or video recording varies with the nature of the evidence that the photograph or video recording is being offered to prove and with the degree of possibility of error. [Citation.] The first step is to determine the purpose for which the evidence is being offered. The purpose of the evidence will determine what must be shown for authentication, which may vary from case to case. [Citation.] The foundation requires that there be sufficient evidence for a trier of fact to find that the writing is what it purports to be, i.e., that it is genuine for the purpose offered. [Citation.] Essentially, what is necessary is a prima facie case. 'As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.' [Citation.]" (*Goldsmith*, *supra*, 59 Cal.4th at p. 267.)

Here, the surveillance videos were not the only "witness" to the crime, unlike in *Goldsmith*. The timestamp helped establish the time of the crime, but other circumstantial evidence supported the conclusion that the Pershing Hotel's videos were captured around 5:00 a.m., such as Mr. Nwude's and Mr. Hughes's testimony. Ms. Anthony testified that she is familiar with how the cameras work, and one of her duties as the Pershing Hotel's desk clerk was to review the surveillance footage on a daily basis. Ms. Anthony became confused when asked about the number of minutes the

20

timestamp was "off." However, she was confident that she testified truthfully at the preliminary hearing that "[o]ur camera is an hour fast, but you have to when you write stuff down, you have -- you have to put camera time and actual time." The inconsistencies in her recollection went to the weight of the evidence and not its admissibility. Her testimony was sufficient for the trier of fact to determine that the videos were what they purported to be, which is all that is required. (See *People v. Valdez* (2011) 201 Cal.App.4th 1429, 1435.) We can find no abuse of discretion on this record.

## 2. Ineffective Assistance of Counsel

Defendant next contends his trial attorney provided ineffective representation when she failed to seek redaction of various statements of "fact" made by police during defendant's interrogation. Without objection to the portions of the interrogation that are now challenged on appeal, the prosecutor played for the jury a videotaped interview of defendant conducted by police on April 18.**10** During the interview, defendant repeatedly

---

**10** When the parties were discussing the People's rebuttal case, the prosecutor indicated that he wanted to play the video of defendant's interview with police. Defense counsel objected on the basis of relevance, and that not all of defendant's statements were admissions. The trial court overruled these objections, but nonetheless asked if any portions of the interview should be redacted. Ultimately, defense counsel only sought redaction of any mention of defendant's tattoos. Finding that the tattoos were not prejudicial, the trial court overruled counsel's objection.

Later, when the parties were discussing jury instructions, defense counsel suggested that the jury be instructed that the officer's statements during the interrogation are not evidence. The court indicated that CALCRIM No. 222, defining what evidence is, would likely serve this purpose. Defense counsel asked if she could draft an instruction, and the court said it would look at whatever she provided. The court indicated that defense counsel "is going to draft up a pinpoint instruction on the evidence. [¶] . . . [¶] . . . Although I would note that I think there is a general instruction about what evidence is already. . . . But I'll consider a pinpoint instruction."

After the prosecution's rebuttal case, the court indicated that it was ready to instruct the jury. The court asked if there was anything else the attorneys needed to address. Defense counsel did not mention a "pinpoint" instruction. The court then read

21

denied the shooting and said he was at the home of his friend Trish. Detective Marengo told defendant that he possessed video evidence showing defendant fleeing from the shooting, that eyewitnesses saw him fleeing the scene, that his phone records were inconsistent with his alibi, and that Trish had made statements inconsistent with his alibi. No evidence about Trish or defendant's phone records was introduced at trial, and the witnesses were unable to identify defendant as the shooter.

A claim of ineffective assistance of counsel has two components: " 'First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' [Citation.] [¶] To establish ineffectiveness, a 'defendant must show that counsel's representation fell below an objective standard of reasonableness.' [Citation.] To establish prejudice he 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*Williams v. Taylor* (2000) 529 U.S. 362, 390-391.)

"[I]f the record sheds no light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for an explanation and failed to provide one, or there could be no satisfactory explanation for counsel's performance." (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015.) "Where the record shows that the omission or error resulted from an informed tactical choice within the range of reasonable competence, we have held that the conviction should be

---

its instructions to the jury. After it read the instructions, the court asked the attorneys if there were any objections to the instructions as they were read. Defense counsel stated, "No." The lawyers then made their closing arguments.

22

affirmed." (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1215; see *People v. Hillhouse* (2002) 27 Cal.4th 469, 502 ["deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance"].)  "It is not sufficient to allege merely that the attorney's tactics were poor, or that the case might have been handled more effectively.  [Citations.]  [¶]  Rather, the defendant must affirmatively show that the omissions of defense counsel involved a critical issue, and that the omissions cannot be explained on the basis of any knowledgeable choice of tactics."  (*People v. Floyd* (1970) 1 Cal.3d 694, 709, disapproved on other grounds by *People v. Wheeler* (1978) 22 Cal.3d 258, 287, fn. 36.)

Defendant asserts that the statements by the interviewing officers were inadmissible hearsay, were highly prejudicial, and his counsel was ineffective for failing to request redaction.  We disagree.  The record readily reveals a tactical basis for defense counsel's failure to object.

Defense counsel could logically have believed defendant's interview with the detectives would benefit the defense.  Throughout the interview, defendant steadfastly denied his involvement in the murder, despite repeated assertions by police to the contrary.  Defendant did not testify at trial.  Thus, the interview provided the only opportunity for jurors to hear defendant's alibi, and consistent denials of his involvement in the shooting.  Had the challenged statements of police been redacted, much of the interview, including defendant's denials of his involvement, would not have made sense.  Defendant's continued denials, in the face of Detective Marengo's assertions, bolstered the credibility of his claimed innocence, as he was unwavering.  Moreover, it is clear that defense counsel understood that the statements by Detective Marengo were not evidence, as she pondered requesting a special instruct to that effect.  Additionally, when she cross-examined Officer Ortiz, she elicited his testimony that police often lie to suspects they are interrogating.

Under these circumstances, it is reasonable to conclude that counsel's reason for not seeking redaction was tactical.  Moreover, defendant cannot establish prejudice

because the challenged remarks were necessary for the nonhearsay purpose of giving context to defendant's responses. (*People v. Maciel* (2013) 57 Cal.4th 482, 524.)

**3.     Improper Opinion**

Defendant contends that Officer Ortiz provided improper lay opinion testimony that defendant was the one depicted in the video images, and that he was the one who killed Mr. Phillip. Defendant objects on appeal that this testimony amounted to an improper opinion that defendant was guilty. The prosecution elicited a portion of the challenged testimony during direct examination, to explain how defendant became a suspect, to rebut defendant's accusations made in counsel's opening statement that police conducted a sloppy investigation, where they did not conduct any tests for gunshot residue and were unable to find a weapon, and that the only evidence of defendant's guilt was a "grainy" and "edited police prosecution video" from which no identification could be reasonably made.

Other statements by Officer Ortiz were elicited during the prosecution's redirect examination, after defense counsel vigorously cross-examined him about the "limited" scope of his investigation. During redirect, the prosecutor asked Officer Ortiz, "Earlier yesterday, you opined, or you gave us your opinion that the defendant is the one who murdered [Conrad Phillip]; is that correct?" Officer Ortiz responded, "That is correct."

Respondent contends the claim of "improper opinion" error has been forfeited, as defendant did not object at trial that the testimony was an improper opinion. He objected only that some of the testimony lacked foundation. The court sustained that objection, and the prosecutor laid a foundation, after which defendant made no further objection.

The prosecutor asked Officer Ortiz if he saw "any footage from the Pershing Hotel that documented the defendant leaving it?" Officer Ortiz answered "Yes." The prosecutor then asked Officer Ortiz to look at one of the images in the PowerPoint presentation (exh. 4), and asked if he saw someone wearing a green jacket. Officer Ortiz answered "Yes." The prosecutor then asked, "Who do you believe that individual to be?" Officer Ortiz answered, "That would be the defendant." Defendant objected, "Lacks foundation." The trial court asked the prosecutor to lay a foundation. The prosecutor

24

asked Officer Ortiz what his opinion was based on. Officer Ortiz responded, "the videos that I have viewed, the totality of this incident, the information I've learned throughout the investigation." The prosecutor then asked Officer Ortiz to identify the individual depicted in additional still images, extracted from the surveillance videos. Officer Ortiz offered his opinion defendant was the person depicted in the still images. The prosecutor asked why Officer Ortiz believed it to be defendant. Officer Ortiz testified that his opinion was based on the clothing the individual was wearing, the time the video was taken, and the location of the individual. Defendant did not object.

Officer Ortiz also testified, without objection, as follows:

"[PROSECUTOR]: If you can, tell us when was it that you believe that you had pinpointed who the suspect was that murdered Conrad Phillip? [¶] . . . [¶]

"[ORTIZ]: When I was viewing the video footage with Mrs. Anthony, Angela Anthony, while we were viewing the video, at one point, she paused and she said, that's Charles, I know him. I've known him for three and a half years, I would know him anywhere, I can tell by his walk.

"[PROSECUTOR]: And that led you to believe that the defendant was the one who murdered Conrad Phillip, correct?

"[ORTIZ]: Yes, after Eunice Dillard concurred, the manager of the apartment, then we were positive that it was Mr. Colbert."

Defense counsel then cross-examined Officer Ortiz about the course and thoroughness of his investigation.

"[DEFENSE COUNSEL]: Ms. Anthony is the person that viewed the video, you went over the video footage with from the Pershing; is that correct?

"[ORTIZ]: That is correct.

"[DEFENSE COUNSEL]: And she is the person who stated that is Mr. Charles Colbert, and I would recognize him, because I've known him for three years; is that correct?

25

"[ORTIZ]:  That's correct.

"[DEFENSE COUNSEL]:  And that's the moment, as the District Attorney indicated, that you saw, okay, this is now a person, Mr. Colbert is now a suspect; is that fair to say?

"[DEFENSE COUNSEL]:  All right.  Now -- so before Ms. Anthony identified Mr. Colbert, you didn't know who that person was [in the video]; is that fair to say?

"[ORTIZ]:  That is fair to say, yes.  [¶] . . . [¶] . . . Actually, let me make a correction.  I did have an idea of who this person was.  Because from the video, I could see that he went -- went into or faced at least one of three rooms [in the hotel].  So it was either 240, 238 or 236.  [¶] . . . [¶]

"[DEFENSE COUNSEL]:  . . .  Now in addition, you collected a lot of video. When you were viewing these hallway videos, did you only view and collect video for after the murder of the hallway in the Pershing Hotel?

"[ORTIZ]:  Yes.

"[DEFENSE COUNSEL]:  So in fact, you did not view any hallway video prior to 5:53 a.m. which is the time stamp there?

"[ORTIZ]:  That's correct.

"[DEFENSE COUNSEL]: In fact, you did not verify that either the deceased, that the deceased came out of his room at that hour?

"[ORTIZ]:  No, I knew they both came out of the building.  What they did inside the building when I was --

"[DEFENSE COUNSEL]:  And you did not see any video footage of Mr. Colbert coming out of his room on the second floor?

"[ORTIZ]:  No.

"[DEFENSE COUNSEL]:  Before 5:53?

"[ORTIZ]:  No.

"[DEFENSE COUNSEL]:  Now, how many people were interviewed in the Pershing Hotel by you?

26

"[ORTIZ]:  There were several attempts, but we were only able to talk to Angela Anthony and Eunice Dillard.  [¶]  . . .  [¶]

"[DEFENSE COUNSEL]:  Just to be clear about the video again, we were at 5th Street and Main, and no camera footage was pulled from the 5th Street side of the Pershing Hotel; is that correct?

"[ORTIZ]:  That is correct.

"[DEFENSE COUNSEL]:  All right.  Although there is a camera there on the 5th Street side --

"[ORTIZ]:  Yes.  Yes, there is . . . .  [¶]  . . .  [¶]

"[DEFENSE COUNSEL]:  Now at any point in time -- so you indicated that you didn't interview other residents of the Pershing Hotel; is that correct?

"[ORTIZ]:  That is correct.

"[DEFENSE COUNSEL]:  And you did not view the video -- did you, did you subpoena any records with regards to his phone, Mr. Phillip's phone?

"[ORTIZ]:  Yes."


Later, during redirect examination, the following colloquy ensued:


"[PROSECUTOR]:  Earlier yesterday, you opined, or you gave us your opinion that the defendant is the one who murdered [Conrad Phillip]; is that correct?

"[ORTIZ]:  That is correct.

"[PROSECUTOR]:  How can you offer us your opinion that it's [the] defendant who murdered [Conrad Phillip] when everything that we have in terms of listed heights shows that . . . defendant is taller than [Conrad Phillip]?

"[ORTIZ]:  All the witnesses are consistent, with the exception of Earl McClinton. . . ."

No defense objection was made to this testimony.

The only objection to the challenged testimony appearing in the record is that Officer Ortiz's opinion lacked foundation.  Generally, any claim of error would be

27

forfeited. (*People v. Chaney*, *supra*, 148 Cal.App.4th at p. 778.) However, defendant contends the failure to object on the basis of improper opinion constitutes ineffective assistance of counsel. We find the testimony provided on redirect that defendant is the one who murdered Mr. Phillip served no legitimate purpose that would assist the jury.

Lay opinion testimony is permitted if rationally based on the witness's perception, and helpful to understanding his testimony. (Evid. Code, § 800.) "Admission of lay opinion testimony is within the discretion of the trial court and will not be disturbed 'unless a clear abuse of discretion appears.' [Citation.]" (*People v. Mixon* (1982) 129 Cal.App.3d 118, 127.) A witness may not express an opinion as to the innocence or guilt of the defendant. (See *People v. Torres* (1995) 33 Cal.App.4th 37, 46-47.) This is not because guilt is the ultimate issue of fact, because opinion testimony often goes to the ultimate issue in the case. (*Id*. at p. 47.) Rather, the rule exists because a witness's opinion regarding the guilt or innocence of a defendant is of no assistance to the trier of fact. The "trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt." (*Ibid*.)

On direct examination, Officer Ortiz was asked to explain how defendant became a suspect in the murder, and why the police zeroed in on him as the suspect. He was never asked for his opinion whether defendant *actually* murdered Mr. Phillip. Rather, he testified that defendant was the person depicted in the videos, based upon information he had obtained over the course of his investigation, to explain why defendant was the primary suspect in the investigation of Mr. Phillip's murder. This evidence was useful to the jury to help them decide whether the lead detective was biased in his investigation and may have overlooked other likely suspects. (See *People v. Marsh* (1962) 58 Cal.2d 732, 738 ["course of investigation" testimony is routinely admitted at trial].)

However, the testimony provided on redirect, that Officer Ortiz believed defendant was the one who murdered Mr. Phillip, did not serve this same legitimate purpose. Rather than explaining why defendant became a suspect, Officer Ortiz opined that defendant was the one who murdered the victim, and explained why that was his belief despite Mr. McClinton's statement the shooter was the shorter of the two men. Defense

28

counsel did not object to this testimony, and there can be "no satisfactory explanation" for her failure to do so. (*People v. Castillo*, *supra*, 16 Cal.4th at p. 1015.)

However, reversal is required only if there is a "'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*Williams v. Taylor*, *supra*, 529 U.S. at pp. 390-391.)

We find no prejudicial error here. The jury was instructed on how to view lay opinion testimony: "Witnesses, who were not testifying as experts, gave their opinions during trial. You may but are not required to accept those opinions as true or correct. You may give the opinions whatever weight you think appropriate. Consider the extent of the witness's opportunity to perceive the matters on which his or her opinion is based, the reasons the witness gave for any opinion, and the facts or information on which the witness relied in forming that opinion. You must decide whether information on which the witness relied was true and accurate. You may disregard all or any part of an opinion that you find unbelievable, unreasonable, or unsupported by the evidence." (See CALCRIM No. 333.) The jury was also instructed that it was their duty to "decide what the facts are. It is up to all of you, and you alone, to decide what happened . . . ." (See CALCRIM No. 200.) We presume that the jury followed the court's instructions absent evidence to the contrary. (*People v. Nguyen* (1995) 40 Cal.App.4th 28, 37.)

Also, there was substantial evidence of defendant's guilt. Defendant and the victim knew one another because they lived in neighboring rooms at the Pershing Hotel and had argued in the past. The victim was shot near the Pershing Hotel, shortly after video footage captured the victim and defendant leaving the hotel. Angela Anthony identified defendant in the videos taken from the Pershing Hotel's cameras. She had known him for years and was familiar with his green jacket and black and white tennis shoes with white soles, with how he wore his hair, and with his distinctive bouncy walk. The jury could plainly conclude the person seen in photographs taken from other cameras, showing a person running away from the murder scene, was defendant, because

29

the clothes were the same as those identified by Ms. Anthony, especially the black shoes with white trim.

Moreover, several eyewitnesses described someone running away from the crime scene, wearing these same clothes. Mr. McClinton saw the shooting, and gave a largely consistent account of defendant's clothing and the direction he ran. Mr. Hughes saw a tall African-American man wearing a green jacket resembling an Army jacket, a hood, and black tennis shoes with white trim, struggling to put a gun in his inside pocket. He saw Mr. Nwude chasing the man with the gun. Mr. Nwude described the man he chased as tall and black, wearing a green Army jacket. As he chased the man, Mr. Nwude saw him reach into his jacket with his right hand.

Moreover, defendant's explanation for his whereabouts during the murder was refuted by testimony from the bus driver, Ms. Canales. Given the state of the evidence, there is no reasonable probability of a different outcome absent counsel's errors.

## 4. Cumulative Error

Lastly, we reject defendant's cumulative error argument because there are not multiple errors to accumulate.

**DISPOSITION**

The judgment is affirmed.


GRIMES, J.

I concur:

BIGELOW, P. J.

30

**Flier, J., Dissenting**

I respectfully dissent with respect to part three of the Discussion. I agree Officer Ortiz provided objectionable testimony and counsel was ineffective in failing to object, but I disagree with the majority's conclusion that counsel's error was not prejudicial.

"A consistent line of authority in California as well as other jurisdictions holds a witness cannot express an opinion concerning the guilt or innocence of the defendant." (*People v. Torres* (1995) 33 Cal.App.4th 37, 46 (*Torres*); see also *People v. Coffman* (2004) 34 Cal.4th 1, 77.) "[T]he rationale for admitting opinion testimony is that it will assist the jury in reaching a conclusion called for by the case. 'Where the jury is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions, then the need for expert testimony evaporates.'" (*Torres,* at p. 47.) Thus, "opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt." (*Ibid.*)

Based on these principles, in *Torres*, the court held it was improper for a police officer to testify a robbery had occurred in the case. (33 Cal.App.4th at p. 45.) The evidence in *Torres* showed the defendant was a "'rent' collector" for a gang, meaning he collected payments "from drug dealers in the gang's territory for the privilege of doing business there." (*Id.* at p. 42.) The jury convicted the defendant of first degree murder with robbery as a special circumstance and two counts of attempted robbery. (*Ibid.*) During the officer's redirect examination, the following colloquy took place between the prosecutor and the officer:

> "'Q. You just had a question which is, would you consider this 'collecting of rent' basically extortion. You said not exactly. How would you describe it?
> "'A. Well, I would describe it as a robbery. My definition of robbery is taking of someone's personal property through force or fear with the immediate danger of something happening to you. I know that is taking place. That is what happened in this particular case. Then when you get extortion, yes, that is happening also, but it's a two-fold issue.

1

"'Q. What's extortion?

"'A. Extortion is taking of somebody's personal property with a fear of a later threat against yourself.

"'Q. In other words, if I have a gun on you right now and demand your money, what is that?

"'A. It's a robbery.'" (*Torres, supra*, 33 Cal.4th at p. 44.)

The court held there was no need for the officer's opinion testimony that the defendant had committed the crime of robbery. (*Torres, supra*, 33 Cal.4th at p. 47.) "The jury clearly was competent to determine from the evidence and the court's instructions" whether the defendant robbed or extorted the victims. (*Ibid.*) Moreover, "expressing the opinion the crimes were robberies was tantamount to expressing the opinion defendant was guilty of robbery and the first degree felony murder" of one victim. (*Id.* at p. 48.)

In this case, Officer Ortiz's testimony was similarly improper. Although the majority has quoted the pertinent testimony above, I will reiterate it here. During the officer's direct examination, the following colloquy occurred:

"[PROSECUTOR:] If you can, tell us when was it that you believe that you had pinpointed who the suspect was that murdered Conrad Phillip?

"[ORTIZ:] The approximate moment where I realized it was the defendant?

"[PROSECUTOR:] Correct.


"[ORTIZ:] When I was viewing the video footage with Mrs. Anthony, Angela Anthony. While we were viewing the video, at one point, she paused and she said, *that's Charles. I know him, I've known him for three and a half years, I would know him anywhere, I can tell by his walk.*

"[PROSECUTOR:] And that led you to believe that the defendant was the one who murdered Conrad Phillip; correct?

2

"[ORTIZ:]  Yes, after Eunice Dillard concurred, the manager of the apartment . . . ."

Then, during the officer's redirect examination, the following colloquy occurred:

"[PROSECUTOR:]  Earlier yesterday, you opined, or you gave us your opinion that the defendant is the one who murdered [Conrad Phillip]; is that correct?

"[ORTIZ:]  That is correct.

"[PROSECUTOR:]  How can you offer us your opinion that it's that defendant who murdered [Conrad Phillip] when everything that we have in terms of listed heights shows that that defendant is taller than [Conrad Phillip]?

"[ORTIZ:]  All the witnesses are consistent, with the exception of Earl McClinton. . . . "

Respondent argues Officer Ortiz never opined about defendant's guilt or innocence.  But the prosecutor's questioning characterized the officer's testimony as exactly that -- an "opinion that it's that defendant who murdered [Conrad Phillip]."  The officer's repeated agreement with the expression that defendant had "murdered" the victim was tantamount to opining that defendant had, in fact, committed murder or was guilty of murder.  Such testimony was inadmissible because it was unnecessary and irrelevant.  The jury, as the trier of fact, was the proper party to examine the evidence and the court's instructions and determine whether defendant was guilty of murder.

Trial counsel's error in failing to object to the officer's testimony was prejudicial to defendant.  To establish prejudice on a claim of ineffective assistance of counsel, a defendant "'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"  (*Williams v. Taylor* (2000) 529 U.S. 362, 390-391.)  It was reasonably probable here defendant would have obtained a more favorable result, absent Officer

3

Ortiz's improper opinion on guilt. While the court instructed the jury on how to weigh lay opinion testimony, anything the police officer said, including his improper opinion, was bound to carry great weight with the jury as his words were the words of the investigating officer in the case.

Moreover, I do not believe there was strong evidence of defendant's guilt. Rather, the whole case against defendant was not particularly strong. There was no forensic evidence linking him to the crime. The evidence of a plausible motive was nonexistent. The most that could be said was that defendant and Mr. Phillip had bickered before. The eyewitnesses to the shooting or those who saw the shooter running away could not identify defendant as the shooter. At best, they could identify the shooter as wearing clothes similar to some that defendant possessed. But defendant's clothes were not unique; there was evidence other men living at the Pershing hotel had green military jackets just like defendant's. The video captures of the suspect from various surveillance cameras were extremely blurry; the quality of the images was so bad that the face of the shooter was nowhere near identifiable. Ms. Anthony identified appellant leaving the Pershing Hotel shortly after Mr. Phillip and wearing the green jacket, but defendant's interview responses offered an explanation for why he was leaving the hotel at that time and then returning to change a short time later. When it came time to make a decision, the jury deliberated on three separate days and sent the court three notes asking about the evidence. Clearly, the jury had reservations about defendant's guilt, suggesting this was not an "open and shut" case. (*People v. Woodard* (1979) 23 Cal.3d 329, 341 [conflicting evidence and approximately six hours of jury deliberations showed court's error was not harmless].)

In short, the evidence of defendant's guilt was far from overwhelming in my view, and there was a highly reasonable probability the improper opinion testimony from Officer Ortiz tipped the balance in favor of the prosecution. For these reasons, I would reverse defendant's conviction and remand the case to the trial court for further proceedings.

4

FLIER, J.